Frank HAMPTON et al., Appellants,

v.

CITY OF JACKSONVILLE, FLORIDA,
et al., Appellees.

No. 19298.

United States Court of Appeals
Fifth Circuit.

May 17, 1962.

Rehearing Denied June 29, 1962.

Ernest D. Jackson, Jacksonville, Fla.,
Jack Greenberg, Constance Baker Motley, Michael Meltsner, New York City,
for appellants.

William M. Madison, Inman P. Crutchfield, Frederick J. Simpson, Ellis T. Fernandez, Jr., Francis Bradley Kennelly, C. Ray Greene, Jr., Jacksonville, Fla.,
for appellees.

Before TUTTLE, Chief Judge, and
JONES and GEWIN, Circuit Judges.

TUTTLE, Chief Judge.

This is an appeal by Negro plaintiffs, residents of the City of Jacksonville, Florida, from a judgment of the trial court refusing to enjoin two private individuals, who had purchased two separate golf courses formerly operated by the City, from restricting the use of the golf courses to white patrons only.

Earlier in the litigation the trial court had enjoined the City of Jacksonville from continuing to operate the golf courses on a racially segregated basis. Thereafter, the City, after taking bids, on terms very favorable to any prospective purchaser, including the right to make a very small down payment and an extended period for paying the balance of the purchase price, accepted bids from the two former golf professionals at the two respective courses for the purchase of the two courses. In one instance there was a down payment of $10,000, and a mortgage for $590,000, for a total purchase price of $600,000; and in the other instance there was a down payment of $15,000, and a mortgage of $600,000, for a total purchase price of $615,000.

Each of the two conveyances contained the following reversionary clause, which had the effect of assuring that the two golf courses would be continued to be used by the purchasers only "for the purpose of a golf course." This reversionary clause is in the following language:

"This conveyance is made upon the express condition that the property hereby conveyed shall be continually

maintained by the Grantee, its successor and assigns, as a golf course which shall be used only for the purpose of a golf course; and if said property be not so maintained or should it be converted to other use, said property will immediately revert to the Grantor, its successor or assigns, and it shall be lawful for the Grantor, its successors or assigns to re-enter and repossess said property and thereafter to peaceably hold and enjoy the same as if this conveyance had not been made."

This reversionary clause was inserted in the deeds pursuant to ordinance passed by the City Commissioners of the City of Jacksonville, and upon the recommendation of one of the City Commissioners, Thomas, who had held the post on the Commission administering the financing of the city's golf courses, parks, and other public amusement places. Commissioner Thomas testified that the reverter clause that he suggested to be placed in the deed was designed for the purpose of insuring the citizens of Jacksonville of having golfing facilities.[1]

It is not contended by the appellants that the deeds were not made in good faith—that is to say, that there were any side agreements or understandings between the City and the purchasers to the effect that the purchasers would operate the golf courses on a segregated basis if they acquired title to them. The basis of their claim that they are en-

titled to the relief sought is that, by virtue of the restrictive covenant in the deed, the City projected its control into the hands of the new owners. Thus, they contend, action of the owner is still City action. There is thus no issue of fact here for our determination. The only question is a legal one: Do the agreed facts compel the conclusion that the operation of the golf course in the hands of the new owners continue to be state action within the purview of the XIV Amendment?

It is conceded, as it must be by the appellees, that if the City of Jacksonville had entered into a long term lease with these grantees, under which an estate for years or a leasehold had been created, to enable the lessees to continue the operation of the City's golf courses, the City would still be involved to the extent necessary to constitute such operation state action. Such is clearly the law, not only in this Circuit but in the other Circuits in which the courts have passed on this proposition. In the case of Derrington v. Plummer, 5 Cir., 240 F.2d 922, this Court said:

"No doubt a county may in good faith lawfully sell and dispose of its surplus property, and its subsequent use by the grantee would not be state action. Likewise, we think that *when there is no* purpose of discrimination, no joinder in the enterprise, or *reservation of control* by the county, it may lease for pri-

1. Commissioner Thomas' testimony on this point was as follows:

"A. I recommended to the City Attorney that he include a reverter clause in the specifications because both of our appraisers when they went out and appraised the property, they said that the best potential value of the golf courses was the continued use as a golf course, so therefore, rather than to confuse the issue more, I recommended the reverter clause be placed in it and they be sold for the continued use as golf courses, so that the City may derive the highest sale price from the courses.

"Q. Commissioner, did you not only say that the purpose of the reverter clause was to provide and to assure the citizens

of Jacksonville of some golfing facilities, something in that order?

"A. I believe I did say that with the reverter clause, the golf courses could not be diverted to warehousing projects, that the citizens of the City of Jacksonville would have golfing facilities.

\* \* \* \* \* \* \*

"Q. Now, this reverter clause that you had in the deed, as you said, was designed for two purposes, one was to get the highest and best value for the property as golf courses and the other was to insure the citizens of Jacksonville of having golfing facilities, am I correct in that statement?

"A. Yes."

vate purposes property not used nor needed for county purposes." (Emphasis added).

In that case we held that a lessee of county courthouse space for restaurant facilities stood in the place of the county and that "His conduct is as much state action as would be the conduct of the County itself."

The United States Supreme Court has recently said in Burton v. Wilmington Parking Authority, 365 U.S. 715, at page 725, 81 S.Ct. 856, at page 861, 6 L.Ed.2d 45:

> " * * * in its lease with Eagle the Authority could have affirmatively required Eagle to discharge the responsibilities under the Fourteenth Amendment imposed upon the private enterprise as a consequence of state participation. But no State may effectively abdicate its responsibilities by either ignoring them or by merely failing to discharge them whatever the motive may be. It is of no consolation to an individual denied the equal protection of the laws that it was done in good faith. Certainly the conclusions drawn in similar cases by the various Courts of Appeals do not depend upon such a distinction. By its inaction, the Authority, and through it the State, has not only made itself a party to the refusal of service, but has elected to place its power, property and prestige behind the admitted discrimination. The State has so far insinuated itself into a position of interdependence with Eagle that it must be recognized as a joint participant in the challenged activity, which, on that account, cannot be considered to have been so 'purely private' as to fall without the scope of the Fourteenth Amendment."

On the other hand, it is clear, and it is conceded by the appellants, that there is no requirement under the Fourteenth Amendment or otherwise that a city must continue to operate such public amusement facilities as a golf course if it decides for any reason that it no longer wishes to do so. See Frank Hampton et al. v. City of Jacksonville, Fla., 5 Cir., 304 F.2d 319, in which we have held that the City of Jacksonville has the legal authority to withdraw from the field of operating swimming pools completely, if it desires to do so. And see City of Montgomery, Ala. v. Gilmore, et al., 5 Cir., 277 F.2d 364; and Tonkins v. City of Greensboro, 4 Cir., 276 F.2d 890. The appellees rely heavily on these decisions, and on the case of Eaton v. Board of James Walker Memorial Hospital, 4 Cir., 261 F.2d 521, as distinguishing the rights of Negro plaintiffs to non-discriminatory use of formerly publicly owned facilities which had been sold in a bona fide sale to private parties, from those cases in which a like claim is made as to formerly publicly owned and operated facilities subsequently leased to private lessees for operation.

Conceptually, it is extremely difficult, if not impossible, to find any rational basis of distinguishing the power or degree of control, so far as relates to the state's involvement, between a long-term lease for a particular purpose with the right of cancellation of the lease if that purpose is not carried out on the one hand, and an absolute conveyance of property, subject, however, to the right of reversion if the property does not continue to be used for the purpose prescribed by the state in its deed of sale. Appellees in this case stress the fact that there is no "immediate control," and that there is no "present interest" in the City of Jacksonville. These are empty phrases when considered in connection with the absolute obligation on the part of the present owners of the property that they *immediately, presently* and *always* use the leased property for golf course purposes, and no other. This is complete present control even though the *daily* operation is, of course, not subject in other matters to the City's direction.

In the case of Boman v. Birmingham Bus Company, 5 Cir., 280 F.2d 531, we noted that when a state authorizes a

city to grant a franchise for public transportation to a local bus or street car company, such transportation service is performed by the franchise holder as a service performed for the benefit of the people of the state. The private company is, to that extent, exercising a part of sovereignty in that it is performing a state function. So, too, where the City of Jacksonville, which has long been in the business of operating golf courses for its residents, elects to sell the golf courses, but only on condition that they continue to be used in such manner that the public will still enjoy their benefits in the same capacity, the city is permitting the private individual to perform this part of the City's function.

Appellees' reliance on Tonkins v. City of Greensboro, supra, is misplaced. In that case there was an outright sale of a swimming pool *without any restriction or reversionary clause of any kind.* The inclusion of the restrictive covenant here is a distinguishing factor of the utmost legal significance. With reference to the Fourth Circuit case of Eaton v. Board of Managers of James Walker Memorial Hospital, supra, it appears that it was decided before the Supreme Court announced its decision in the Wilmington Parking case, supra. Being unable, as we are, to find any valid distinction between the effect of the lease in the Wilmington Parking Authority case and the sale with a reversionary interest in the Walker Hospital case, we doubt whether the Court of Appeals for the Fourth Circuit would have decided the Hospital case as it did had it followed the Supreme Court decision. In any event, we feel that this Court's decision in Derrington v. Plummer, supra, expresses the law of this Circuit, which furnishes the guide to our action.

We conclude that the inclusion of the reversionary clause in these conveyances constituted the purchasers of the two golf courses state agents, within the purview of the Fourteenth Amendment.

The judgment of the district court, therefore, must be Reversed and the case Remanded to the trial court for further proceedings not inconsistent with this opinion.

GEWIN, Circuit Judge (dissenting).

In this case the majority opinion assigns the judicial plow to an earthmoving task in strange new ground. Being unable to follow the winding and flexuous course of the furrows that skim across the surface in important areas, cut a shallow track at other places, and never reach standard depth anywhere, I respectfully dissent.

At best, the majority opinion constitutes an unwarranted extrapolation of the principle of equal protection of the laws as set forth in the Fourteenth Amendment.

On April 1, 1959, effective as of April 7, 1959, the same court and the same judge, upon the plaintiffs' motion for a summary judgment, entered its final decree restraining the City of Jacksonville, Florida, its officers, agents, servants and employees and their successors in office, from refusing to allow the plaintiffs and other Negroes similarly situated to use two golf courses upon the same conditions as white persons. The court retained jurisdiction for the purpose of enforcing the injunction. On April 6, one day before the injunction was to take effect, the City of Jacksonville closed both golf courses. On August 11, 1959, the City passed an ordinance authorizing the sale of the golf courses, and on February 19, 1960, the city sold Hyde Park Golf Course to Fred A. Ghioto; and on February 29, 1960, the City sold the Brentwood Golf Course to Ronald Hurley. The race question is not mentioned in the ordinance, the minutes, the deeds or the mortgages.

On February 5, 1960, before the sales were consummated, appellants filed a petition to modify the final decree and asked the District Court to enjoin the sale of the golf courses; make the purchasers parties to the suit; and to enjoin them (the purchasers) from refusing to permit petitioners and other Negro citizens similarly situated the use of the

golf courses upon the same basis as white persons.[1]

Logically, it appears to be appropriate to follow the reasoning of the majority opinion in the sequence there chosen.

The trial court who heard the evidence found as a fact that the two deeds and two purchase money mortgages in question contained no restriction as to the use of the property with respect to race; that no collusion, illegality, fraud or clear abuse of discretion had been shown to exist with respect to either of the sales of the golf courses; and that the sales were bona fide and without side agreement. The appellants in their reply brief state, "Appellants do not seek on this appeal to overturn the findings of fact of the District Court * * *", and further, " * * * do not challenge the findings of the District Court that the sale was bona fide and without side agreement"; and further, appellants do not challenge the power of the City to sell rather than integrate recreational facilities. While my brothers of the majority admit the validity of the sales as bona fide "without side agreement", the opinion insinuates a connotation otherwise, by making reference to the sales as being "on terms favorable to any prospective purchaser, including the right to make a very small down payment and an extended period for paying the balance of the purchase price * * *"; the fact that two golf professionals purchased the courses; and that Commissioner Thomas recommended the sale.

The record is devoid of any evidence from which even an inference could be drawn that the appellants have been denied the right to play golf on the courses since the sales were consummated. The petition was filed before the sales were completed. There is no indication that the appellants, or any of their associates, or anyone interested in them, made any effort whatever to purchase the property. The sales were advertised extensively, and the public at large was invited to tender bids for the purchase of the courses. In oral argument, counsel for appellants admitted that the purchasers (present owners) of the golf courses had the right to restrict golfing to members of the Negro race or could mix Negro and white golfers on the courses without violation of any of the terms of the sales.

It is also quite obvious that the present owners could sell the property, lease it or exercise any acts of ownership and possession they desire, subject only to the provision that the property must be used as golf courses.[2] If the City should undertake any control whatever which

---

1. As set forth in appellants' brief, the issues are as follows:

"* * * Under the sale retains a present valuable interest in both golf courses and that this interest under the sale will anner (sic) to the benefit of the citizens of Jacksonville and for said reasons unless the purchasers of both golf courses are enjoined from refusing to permit the petitioners and other colored citizens similarly situated to use the Hyde Park and Brentwood Golf Courses upon the same basis and upon the same conditions as white persons are permitted to use them, they will be denied the equal protection of the law * * *" (R. 6).

And that:

"* * * The purported sale * * * is an act of subterfuge on the part of the Defendant City of Jacksonville in an effort to abridge the rights of the petitioners and other colored citizens similarly situated in that the * * * price and conditions of each sale are unusual and uncommon * * * and * * * in bad faith" (R. 7).

2. While it is now conceded that there is no fact issue for our determination, the chief insistence of the appellants before the trial court was an issue of fact as to the validity of the sales.

In its order dismissing the petition to modify the final decree entered on April 1, 1960, the court found the issues to be as follows:

"The basic contentions made by plaintiffs in said petition were that the pending sales of the two golf courses and the transactions leading up to their sale were taken in bad faith, that the sales were not bona fide, were without adequate consideration, were an act of subterfuge to abridge the rights of plaintiffs and other colored citizens similarly situated from using said golf courses, and that the de-

violates the rights of the appellants, it and its officers, agents, servants, employees, or their successors in office must answer to the District Court for violation of the injunction and be subject to the judgment of that court for such violation.

After concluding, in the fashion herein outlined, that there is *no issue of fact* for our determination, the majority opinion holds that the legal conclusion reached by the trial court are not supported by the undisputed findings of fact.

The opinion proceeds to a consideration of the case of Derrington v. Plummer, 5 Cir., 240 F.2d 922, which had under consideration a lease. The opinion seems to conclude that every lease by city or county where the question of racial discrimination is in the background is unlawful. Yet, the quoted provision from Derrington clearly holds that leases which meet the required standard therein set forth may be valid; and further, the quoted opinion unqualifiedly asserts, "No doubt a county may *in good faith* lawfully sell and dispose of its surplus property, and its subsequent use by the grantee would not be state action.". (emphasis added)

The following facts in Derrington clearly distinguish it from the instant case. In the first place the property involved was not surplus property. It was the County Courthouse, closely related to all the functions of the County. A lease and not a sale was involved. By the terms of the lease, the County agreed to provide water service, lighting, heating and air conditioning. Employees of the County were to be given a 10% reduction in the price of food and drinks "through the use of coupons or meal tickets or other means as may be *determined by the Commissioners Court of Harris County*". (emphasis added) As stated in the Derrington opinion, discrimination had been practiced under the lease as a matter of fact: "During the original period of the lease, appellees undertook to purchase food in the cafeteria and Derrington refused them permission solely because they were Negroes.". Further, it was stipulated that if appellees or any other Negroes were again to present themselves for service,

---

fendant city still retained an interest in said golf courses sufficient to require the purchasers to permit all citizens the use of same." (R. 201–2).

The court found the following facts:

"4. The two deeds and the two mortgages referred to above contained no restriction as to the use of the property with respect to race."

"5. There was no proof at the trial of any sort that any racial restrictions were imposed by any side agreement or any understanding, any tacit understanding or anything else, between the City Commission or anyone else connected with the city and each of the two purchasers, defendant Ghioto and Hurley, nor that said sales were not bona fide in all respects." (R. 204)

Throughout the trial, counsel for the appellants relied heavily on the allegations of subterfuge, fraud, etc. With reference to the admissibility of certain evidence, counsel for the appellants stated as follows:

"Mr. Jackson:

"Your Honor, our original issue in this matter dealt with the question of whether or not the whole transaction here involved subterfuge." (R. 140)

The trial court stated the chief issue before it to be as follows:

"The Court:

"I certainly don't want to decide this case on any narrow technical ground. I don't want to exclude evidence on narrow technical grounds. I don't think it's the way to approach this case. I will permit examination about discussion between Commissioners of the reasons and terms of the sale and matters of that sort. Of course as to the actual vote on the sale, as you point out, they perhaps are exercising a legislative function, but this attack made by this petition is on the bona fides both of the Commission, the executive body of the City and of the two purchasers, these two impleaded defendants, Mr. Hurley and Mr. Ghioto, and I think we may as well open the thing up and see what happened. . That's my view about it and you may continue along this course of examination, Counsel." (R. 130)

At the request of counsel for appellants, the witnesses were under the rule and as stated by the trial court in the quoted excerpts, the appellants were given every opportunity to present every shred of evidence available.

"* * * Derrington * * * would probably refuse to serve members of the Negro or colored race for the sole reason that they were members of the Negro or colored race". Of greater consideration however, as the opinion so clearly states, it this fact: "* * * the basement of the courthouse can by no means be termed surplus property not used nor needed for County purposes. To the contrary, the courthouse had just been completed, built with public funds for the use of the citizens generally, and this part of the basement had been planned, equipped and furnished by the County for use as a cafeteria.". Obviously, the County owned title to its own courthouse; and operated and managed the building in which the cafeteria was located.

The majority then seeks support from the recent case of Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 decided April 17, 1961. Adroitly, the majority seeks to use the cited case to establish the proposition that it was the duty of the City of Jacksonville to insert a provision in its deeds to the purchasers requiring the purchasers to discharge the responsibilities placed upon states by the Fourteenth Amendment. Such is not the holding of the Burton case. In Burton the court was careful to point out the facts which caused it to hold the lease invalid, among which are the following:

(a) "The parking building is owned and operated by the Wilmington Parking Authority, an agency of the State of Delaware, and the restaurant is the Authority's lessee."

(b) "The City of Wilmington gave the Authority $1,822,827.69 which sum the Authority applied to the redemption of the Revenue Bonds."

(c) The lessee spent some $220,000.00 to make this space suitable for its operation and, "to the extent such improvements were so attached to realty as to become part thereof, Eagle to the same extent enjoys the Authority's tax exemption".

(d) "The Authority further agreed to furnish heat for Eagle's premises gas service for the boiler room, and to make, at its own expense, all necessary structural repairs, all repairs to exterior surfaces except store fronts and any repairs caused by lessee's own act or neglect. The Authority retained the right to place any directional signs on the the exterior of the let space which would not interfere with or obscure Eagle's display signs."

(e) "The Authority has power to adopt rules and regulations respecting the use of its facilities except any as would impair the security of its bondholders."

(f) "Upon completion of the building, the Authority located at appropriate places thereon official signs indicating the public character of the building, and flew from mastheads on the roof both the state and national flags."

(g) "The land and building were publically owned. As an entity, the building was dedicated to 'public uses' in performance of the Authority's 'essential governmental functions'."

(h) "The commercially leased areas were not surplus state property, but constituted a physically and financially integral and, indeed, indispensable part of the State's plan to operate its project as a self-sustaining unit. Upkeep and maintenance of the building, including necessary repairs, were responsibilities of the Authority and were payable out of public funds."

(i) "Should any improvements effected in the leasehold by Eagle become part of the realty, there is no possibility of increased taxes being passed on to it *since the fee is held by a tax-exempt government agency.*" (emphasis added);

and finally the court finds as a fact:

"The State has so far insinuated itself into a position of interde-

pendence with Eagle that it must be recognized as a joint participant in the challenged activity, which, on that account, cannot be considered to have been so 'purely private' as to fall without the scope of the Fourteenth Amendment."

The facts in the Burton case are a far cry from a bona fide sale without side agreement such as we have here admittedly.

The Burton case goes farther and establishes the legal principles applicable, among which are the following significant, clear and unequivocal pronouncements of the law:

1. The principle of equal protection as set forth in the Fourteenth Amendment "is only such action as may fairly be said to be that of the States. That Amendment erects no shield against merely private conduct, however discriminatory or wrong."

2. There must be "state participation through any arrangement, management, funds or property", and "[i]ndividual invasion of individual rights is not the subject matter of the amendment".

3. "Private conduct abridging individual rights does no violence to the Equal Protection Clause *unless to some significant extent* the State in any of its manifestations has been found to have become involved in it." (Emphasis supplied.)

In spite of the last quoted rule that the state must be involved "to some significant extent", the majority opinion holds that the City of Jacksonville has violated the equal protection clause of the Fourteenth Amendment because it indicates that the City is, *"exercising a part of sovereignty"* in that it is performing a state function. (Emphasis supplied.)

With reference to the reverter clause,[3] my brothers of the majority have fallen into two grievous errors:

1. They fail to see a distinction between the so called "lease cases" and the case under consideration. In effect, the court holds that this transaction was not a sale, but was a lease so far as the questions to be decided by us are concerned. "Conceptually", the court finds the same degree of control reserved in the reverter clause as it would find in a long term lease.

2. The majority erroneously concludes that the reverter clause retains in the City "complete present control".[4]

It is difficult to understand such a conclusion. To hold that the reverter clause here under attack vests in the City *complete present control,* violates long established rules of real estate law generally; the decisions of the Florida Supreme Court; and the applicable rules according to the latest edition of Restatement of The Law on the subject of future interests in real estate. In the case of Sorrels v. McNally, 89 Fla. 457, 459, 105 So. 106, the Supreme Court of Florida has held as follows:

"A possibility of reverter is created by the conveyance of a limited fee, and while in some respects it is similar to a reversion, in others

---

3. See reverter clause set forth in majority opinion.

4. Black's Law Dictionary, 4th Edition (1951) defines the adjective "complete" as follows:

"Full, entire; including every item or element of the thing spoken of, without omissions or deficiencies; as, a 'complete' copy, record, schedule, or transcript."

"Perfect; consummate; not lacking in any element or particular; as in the case of a 'complete legal title' to land, which includes the possession, the right of possession, and the right of property."

See also 8 Words & Phrases, "Complete", p. 386; and Webster's Third International Unabridged Dictionary.

Black defines "control" as follows:

"Power or authority to manage, direct, superintend, restrict, regulate, direct, govern, administer, or oversee."

See also 9A Words & Phrases, "Control", p. 4; and Webster's Third International Unabridged Dictionary.

it is quite different. *It is not an estate, but the mere possibility of having an estate at some future time."* (Emphasis supplied.)

Patton on Titles, Second Edition, Volume 1, Section 203, page 454 defines the interest as follows:

"A determinable fee is considered to be a fee estate because of the fact that it may endure forever in a man and his heirs * * * Upon the termination of such a fee, the title reverts to the grantor or his heirs, without the necessity of claim of reentry. *In the meantime, the whole estate is considered as being in the holder of the base fee* with a mere possibility of reverter in its creator." (Emphasis supplied.)

See also Tiffany Real Property, Third Edition, Volume 1, page 386; and 33 American Jurisprudence, Section 206, for substantially the same statement of the law.

Perhaps the best statement of the rule is set forth in Restatement, Property, Future Interests, Volume 2, § 155, page 532 (1936):

"A power of termination is the future interest created in the transferor, or his successor in interest, by a transfer of either an estate in land or an analogous interest in a thing other than land, subject to a condition subsequent."

"Illustration:

"1. A, owning Blackacre in fee simple absolute, transfers Blackacre 'to B and his heirs upon the express condition that if Blackacre is used for other than residence pur-

poses A and his heirs may enter and terminate the estate hereby transferred'. A has a power of termination." [5]

The holding of the majority that these fundamental real property laws correctly stated in ancient and modern texts are " * * * empty phrases * * * " is untenable in my view.

The case of Boman v. Birmingham Transit Company, 5 Cir., 280 F.2d 531, relied upon by the majority is not in point. Although the opinion in the instant case refers to the Birmingham Bus Company as "the private company", the opinion in Boman characterizes it as a public utility engaged in the business of furnishing transportation to the public, operating on the public streets of the city, engaged in "the public's business" and " * * * doing something the state deems useful for the public necessity or conveyance". As further pointed out in Boman, "this is what differentiates the public utility which holds what may be called a 'special franchise', from an ordinary business corporation * * *." It is not simply "the private company".

It also seems to me that the majority has reverted to an unsupported statement of fact (though earlier stating that "There is no issue of fact here for our determination."), when the assertion is made in summarizing the support claimed from Boman that the golf courses were sold " * * * only on condition that they continue to be used in such manner that the public will still enjoy their benefits *in the same capacity * * *".* (emphasis added) Factually, the golf courses were not sold on the condition

---

5. Cross reference is made to Restatement, Property, Vol. 1, § 24, p. 59 (1936) which defines the term "condition subsequent" as follows:

"The term 'condition subsequent' denotes that part of the language of a conveyance, by virtue of which upon the occurrence of a stated event the conveyor, or his successor in interest, has the power to terminate the interest which has been created subject to the condition subsequent, but which will continue until this power is exercised."

The nature of the estate conveyed is further defined in Restatement, Property, Vol. 1, § 45, p. 133 (1936) as follows:

"An estate in fee simple subject to a condition subsequent is created by any limitation which, in an otherwise effective conveyance of land, (a) creates an estate in fee simple; and (b) provides that upon the occurrence of a stated event the conveyor or his successor in interest shall have the power to terminate the estate so created."

that they continue to be used "in the same capacity". The reverter only requires that they be used as golf courses— not segregated golf courses. The use of the phrase "in the same capacity" gives me the impression that the city has restricted the use of the golf courses in such manner as to prohibit their use by Negroes. The courses had been operated on a segregated basis before the injunction and the sale. There is now no such condition involved.[6]

In speaking of " * * * the right of reversion if the property does not continue to be used for the purpose prescribed by the state in its deed of sale" as being a reason for reversing the trial court, the majority indicates that "the purpose prescribed by the state" is an unlawful purpose. There is nothing unlawful in the reverter provision insofar as the equal protection clause of the Fourteenth Amendment is concerned. The trial court found the fact to be that no discrimination was involved in the transaction. In the lease cases cited there was a clear purpose of discrimination. If we accept the facts as found by the trial court that there has been no purpose of discrimination in this transaction, it seems inappropriate to assert that the purpose prescribed in the sale involved here is substantially the same as the purpose involved in the discriminatory leases mentioned.

We can not agree that consideration of Tonkins v. City of Greensboro, 4 Cir., 276 F.2d 890, is out of place here. While an outright sale with no reverter clause was involved there, it should be remembered that one of the chief issues before the trial court in this case was the claim of appellants that the sale was not bona

fide and was infected with collusion. That issue was not abandoned until the appellants filed their reply brief. Even so, Tonkins still has some application in the instant case. Note 1 of the majority opinion quotes the testimony of Commissioner Thomas apparently to reflect on the motives involved in the sales; and the majority opinion emphasizes the factual consideration that the reverter clause was inserted in the deeds, " * * * upon the recommendation of one of the City Commissioners, Thomas, who had held the post on the Commission administering the financing of the city's golf courses, parks, and other public amusement places". In Tonkins the complaining parties relied heavily on the fact that Dr. Taliaferro as a member of the Parks & Recreation Commission " * * * did actively oppose the plaintiffs' demand and recommend sale of the pool, and that he was later instrumental in organizing the corporation which ultimately purchased it from the City." I agree that these considerations relate to the facts. As such, they are not applicable if the findings of the trial court were accepted at face value, as they should be.

The Eaton case [7] is dismissed with the following comment:

" * * * we doubt whether the Court of Appeals for the Fourth Circuit would have decided the Hospital case as it did had it followed the Supreme Court decision."

The Eaton case was decided on November 29, 1958—less than four years ago. Certiorari was denied by the Supreme Court on May 4, 1959, three years ago. The Supreme Court decision referred to in the quotation is the Burton case—decided April 17, 1961, about one year ago.

6. As pointed out in Note 1, the appellants in their original complaint stated that "unless the purchasers of both golf courses are enjoined from refusing the petitioners and other colored citizens similarly situated from using Hyde Park and Brentwood Golf Courses upon the same basis and upon the same conditions as white persons are permitted to use them, they will be denied equal protection of the law". No evidence was offered however that the purchasers have practiced discrimination and that allegation was never proved. Such allegation was joined with and formed a part of the assertion in the complaint that the city " * * * under the sale retains a present valuable interest * * *".

7. Eaton v. Board of Managers of the James Walker Mem. Hosp., D.C., 164 F. Supp. 191; 4 Cir., 261 F.2d 521; 359 U.S. 984, 79 S.Ct. 941, 3 L.Ed.2d 934.

As demonstrated by an analysis of the Burton case above herein, we see no conflict in these decisions.

Actually, the Eaton case is well reasoned and deserves the highest consideration. The facts are almost identical with the instant case, including a reverter clause.[8]

In Eaton the court deals with other cases presenting essentially the same problem, all of which support the conclusion reached in Eaton. It is interesting to note that the District Court[9] which was affirmed in the Eaton decision had this to say about the reverter clause there under consideration:

"The only way the City and County can claim an interest in the property or any control over the property would be in the event that the hospital ceased to be used for the care of the sick and afflicted of New Hanover County. The purpose and effect of the deed is to carry out the intent of the charter to create a public charity but not a public corporation. The City and County may eventually regain the property, but this possibility is distinctly within the control of the hospital corporation. Only the latter possesses initiative with regard to the same." (164 F.Supp. p. 197)

Gross inconsistency in judicial pronouncements is an evil which we should not precipitate, whether unwittingly or deliberately. Philosophically, there are those who believe that consistency is a jewel, while others claim it to be a virtue of fools. Stare decisis should not control to the point of holding the court to ancient principles which no longer serve a good purpose. If correct moral reasons exist for overruling former judgments, former judgments should be overruled.

All courts sit to correct errors, including those of its own; and if precedents must be overruled to achieve justice, that should be done.

Chief Justice Bleckley of the Supreme Court of Georgia in the case of Ellison v. Georgia Railroad Co., 87 Ga. 691, 696, 13 S.E. 809 (1891) said:

"Minor errors, even if quite obvious, or important errors, if their existence be fairly doubtful, may be adhered to, and repeated indefinitely; but the only treatment for a great and glaring error affecting the current administration of justice in all courts of original jurisdiction is to correct it. When an error of this magnitude, and which moves in so wide an orbit, competes with truth in the struggle for existence, the maxim for a supreme court,—supreme in the majesty of duty as well as in the majesty of power,—is not stare decisis, but fiat justitia ruat coelum."

In the case of Galloway Coal Co. v. Stanford, 215 Ala. 79, 109 So. 377 (1926) Justice Somerville made the following comment on the doctrine of stare decisis:

"The doctrine of stare decisis forbids that judicial decisions deliberately rendered should be set aside, unless they are clearly wrong and violative of sound principle or social morality. It expresses the conservatism of the law, and underlies its entire structure. If it be disregarded there can be no system of law, but only chaos reflecting the vacillating opinions of the judges who come and go."

Court decisions however, affect the very existence of people. Properly applied, the rule of stare decisis is ground-

8. "Upon the completion of the building in 1901, the City and County conveyed the tract of land upon which it stood to the new Board of Managers of the hospital to hold in trust for the use of the hospital so long as it should be maintained as such for the benefit of the City and County, with reverter to the City and County in case of its disuse or abandonment.

Subsequently additional land was acquired and additional buildings were erected by the Board of Managers." Eaton v. Board of Managers of James Walker Mem. Hosp., 4 Cir., 261 F.2d 523.

9. Eaton v. Board of Managers of James Walker Mem. Hosp., D.C., 164 F.Supp. 191.

ed on the practical consideration that security and certainty require that long accepted, fundamental and established legal principles under which rights may accrue or penalties be invoked should not be disregarded for light or transient reasons.

Negro citizens of Jacksonville, Florida, and everywhere are entitled to fair and impartial treatment. They are not entitled to special treatment. To emasculate ancient rules which have guided the Judiciary through its long history solely for the purpose of achieving a particular result, is to set the judicial ship afloat in troublesome waters without chart, compass or rudder. Litigants are entitled to expect faithful obedience to well established rules, but no litigant is entitled to have a rule made solely for his benefit; especially when such special rules destroy the ancient landmarks and guidelines by which people have been taught to chart their affairs. Our function is jus dicere and not jus dare. There are no talismanic words which will convert illogical and unreasonable conclusions into logical and reasonable ones.

I would affirm.

JONES, Circuit Judge (specially concurring).

The City Commissioner who had been in charge of its golf courses testified that if its golf courses were operated without racial discrimination the play would fall off to an extent that there would be operational losses too great for the City to bear. If the City could not operate the courses on a non-segregated basis without losses too great to bear, it is not to be supposed that a private owner could profitably operate without discrimination, or that such an operator, who had made his purchase with little more than a token payment, could or would operate at a loss.

The City Commissioner's testimony showed two purposes for the inclusion of the reverter clause in the deed, first to obtain the highest value for the property and second, to insure the citizens of Jacksonville of having golfing facilities.

Since the City believed the golf courses could not be operated without losses on a non-segregated basis, and nothing appears to indicate that the purchasers could operate otherwise, it follows that the reverter clause was intended to insure the operation of the golf courses for the citizens of Jacksonville who are white to the exclusion of those who are colored. This, I think, is State action.