**Hazel PALMER et al., Appellants,**

v.

**Allen C. THOMPSON, Mayor, City of Jackson, et al., Appellees.**

**No. 23841.**

United States Court of Appeals Fifth Circuit.

Oct. 9, 1969.

Concurring Opinion Jan. 7, 1970.

Dissenting Opinion Nov. 25, 1969.

John R. Brown, Chief Judge, and Tuttle, Wisdom, Thornberry, Goldberg, and Simpson, JJ., dissented.

L. H. Rosenthal, Jackson, Miss., Paul A. Rosen, Detroit, Mich., William Kunstler, New York City, for appellants.

Thomas H. Watkins, E. W. Stennett, Jackson, Miss., for appellees.

Before JOHN R. BROWN, Chief Judge, and RIVES, TUTTLE, WISDOM, GEWIN, BELL, THORNBERRY, COLEMAN, GOLDBERG, AINSWORTH, GODBOLD, DYER and SIMPSON, Circuit Judges.*

* Judge Clayton, now deceased, participated in the decision of this case and expressed his written concurrence in the opinion and decision on February 5, 1968, prior to his last illness which disabled him from any further participation or action.

RIVES, Circuit Judge:

The briefs and arguments on rehearing en banc have been confined to the first point discussed in the original opinion; that is, to whether the City of Jackson denied the equal protection of the laws to Negroes by the closing of all of its public swimming pools. The findings of fact by the district court on this point were set forth in the original opinion, and, for convenience, are again quoted:

"The City of Jackson closed all swimming pools owned and operated by it in 1963, following the entry of a declaratory judgment by this Court in the case of Clark v. Thompson, 206 F.Supp. 539, affirmed 313 F.2d 637, cert. den. 376 U.S. 951, 84 S.Ct. 440, 11 L.Ed.2d 312. No municipal swimming facilities have been opened to any citizen of either race since said time, and the City Council does not intend to reopen or operate any of these swimming facilities on an integrated basis. The personal safety of the citizens of the City and the maintenance of law and order would be endangered by the operation of public swimming pools on an integrated basis. These pools could not be economically operated in that manner. Although closed, the swimming facilities owned by the City are being properly maintained. In addition to closing the swimming facilities owned by it, the City cancelled its lease covering the Leavell Woods swimming pool in 1964."

On this rehearing we would observe the admonition of the Supreme Court that "generalizations do not decide concrete cases. 'Only by sifting facts and weighing circumstances' (Burton v. Wilmington Parking Authority, *supra* [365 U.S. 715], at 722 [81 S.Ct. 856, 6 L.Ed.2d 45]) can we determine whether the reach of the Fourteenth Amendment extends to a particular case." Evans v. Newton, 1966, 382 U.S. 296, 299, 300, 86 S.Ct. 486, 488, 15 L.Ed.2d

373.[1] So doing, we search for further facts and circumstances.

First, it should be noted that the district court's findings were entered on the hearing of the plaintiffs' application for a temporary injunction. Thereafter the parties stipulated:

" * * * that this action be and the same is hereby submitted to the Court for final decision on the merits on the complaint, answer, and affidavits heretofore filed and submitted by the parties, and on the full and complete hearing heretofore afforded the parties, at which all parties had an opportunity to offer any and all evidence desired, and on this Court's letter opinion filed herein dated September 14, 1965, and on this Court's separate findings of fact and conclusions of law filed herein by this Court in connection with this Court's order overruling plaintiffs' application for a temporary injunction.

"IT IS FURTHER STIPULATED and agreed that a final judgment may be entered herein on the foregoing without further hearing and without the offering of any further or additional evidence herein."

The district court then, upon the same findings of fact, entered final judgment that the plaintiffs are not entitled to relief. We note particularly that all parties agreed that they have "had an opportunity to offer any and all evidence desired."

In the case of Clark v. Thompson, cited by the district court, a declaratory judgment had been entered, "That each of the three plaintiffs has a right to unsegregated use of the public recreational facilities of the City of Jackson." After that decision had been affirmed per curiam by this Court and certiorari denied by the Supreme Court, the zoo, parks, and all recreational facilities except the pools were opened to the use of whites and blacks alike. The pools were closed. The only evidence as to the

---

1. To like effect, see Reitman v. Mulkey, 1967, 387 U.S. 369, 378, 87 S.Ct. 1627, 18 L.Ed.2d 830.

reasons and motives for such closing is contained in affidavits of the Mayor and of the Director of the Department of Parks and Recreation. We quote from the Mayor's affidavit:

"Realizing that the personal safety of all of the citizens of the City and the maintenance of law and order would prohibit the operation of swimming pools on an integrated basis, and realizing that the said pools could not be operated economically on an integrated basis, the City made the decision subsequent to the Clark case to close all pools owned and operated by the City to members of both races. The City thereby decided not to offer that type of recreational facility to any of its citizens, and it has not done so and does not intend to reopen any of said pools.

"All other recreational facilities have been completely desegregated and have been made available to all citizens of the City regardless of race."

The Director's affidavit was to the same effect and was supplemented by a second affidavit stating the average annual operating expense and revenue of the pools for the years 1960, 1961 and 1962, from which it appears that there was an average annual loss of $11,700.00. The affidavit concluded: "that the City of Jackson would suffer a severe financial loss if it attempted to operate said pools, or any of them, on an integrated basis."

True, the City decided to close the pools rather than to operate them on an integrated basis. There was, however, no evidence that it reached that decision in an effort to impede further efforts to integrate. Nor did the court find any intent to chill or slow down the integration of other recreational facilities. To the contrary, as the Mayor's affidavit states, those were completely desegregated and made available to all citizens of the City regardless of race. The pools were closed because they could not be operated safely or economically on an integrated basis. Is that a denial of equal protection of the laws?

If so, then the plaintiffs must prevail, for " * * .* law and order are not * * * to be preserved by depriving the Negro children of their constitutional rights." [2] Desirable as is economy in government and important as is the preservation of the public peace, "this aim cannot be accomplished by laws or ordinances which deny rights created or protected by the federal Constitution." [3] For that principle to be applicable, however, it must be held that the result of closing the pools because they cannot be operated safely or economically on an integrated basis deprives Negroes of the equal protection of the law. In our opinion that simply is not true.

The operation of swimming pools is not an *essential* public function in the same sense as the conduct of elections,[4] the governing of a company town,[5] the operation or provision for the operation of a public utility,[6] or the operation and financing of public schools.[7]

2. Cooper v. Aaron, 1958, 358 U.S. 1, 16, 78 S.Ct. 1401, 1409, 3 L.Ed.2d 5, 19.

3. Buchanan v. Warley, 1917, 245 U.S. 60, 81, 38 S.Ct. 16, 20, 62 L.Ed. 149.

4. Nixon v. Condon, 1932, 286 U.S. 73, 52 S.Ct. 484, 76 L.Ed. 984; Smith v. Allwright, 1944, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987; Terry v. Adams, 1953, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152.

5. Marsh v. Alabama, 1946, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265.

6. Public Utilities Com'n of District of Columbia v. Pollak, 1952, 343 U.S. 451, 72 S.Ct. 813, 96 L.Ed. 1068; Burton v. Wilmington Parking Authority, 1961, 365 U.S. 715, 724, 81 S.Ct. 856; Boman v. Birmingham Transit Co., 5 Cir. 1960, 280 F.2d 531; Baldwin v. Morgan, 5 Cir. 1961, 287 F.2d 750, 755.

7. Brown v. Board of Education, 1954, 347 U.S. 483, 493, 74 S.Ct. 686, 98 L.Ed. 873; Guillory v. Administrators of Tulane University, E.D.La.1962, 203 F. Supp. 855, 859, 863; Hobson v. Hansen, D.D.C.1967, 269 F.Supp. 401.

Under the impetus of the declaratory judgment in Clark v. Thompson, *supra,* the City was making the transition in the operation of its recreational facilities from a segregated to an integrated basis. It had considerable discretion as to how that transition could best be accomplished. Local authorities have the duty of easing the transition from an unconstitutional mode of operation to one that is constitutionally permissible. That has been held true as to the reapportionment of the state legislative bodies [8] and as to the desegregation of the public schools.[9] The Constitution does, however, require that the end result be constitutionally permissible.

The equal protection clause is negative in form, but there is no denying that positive action is often required to provide "equal protection." That is frequently true as to essential public functions. Other functions permit more latitude of action. As to swimming pools, which a city may furnish or not at its discretion, it seems to us that a city meets the test of the equal protection clause when it decides not to offer that type of recreational facility to any of its citizens on the ground that to do so would result in an unsafe and uneconomical operation.

There is, of course, no constitutional right to have access to a public swimming pool. No one would question that proposition in circumstances having no racial overtones; as, for example, where all citizens of a municipality are of the same race, the closing of all municipal pools would embody no unconstitutional action or result.[10]

Attempts to analogize this case to Reitman v. Mulkey, 1967, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 and Griffin v. County School Board of Prince Edward County, 1964, 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256, offer little assistance. In *Reitman,* the Court held unconstitutional a recently adopted state constitutional amendment which declared that no agency of the state could interfere with the right of a property vendor or lessor to sell, rent or lease to anyone he chose. Considering the "purpose, scope, and operative effect" of the amendment, the Court stated that by, in effect, nullifying existing fair-housing laws, the state had adopted an affirmative policy of encouraging private discrimination. Significant state involvement in the private housing market, by prior regulation of fair-housing practices, supported the Court's conclusion. This case offers no circumstances involving the regulation of private activity, the abandonment of which can be transmuted into discriminatory state action. It is significant further that the subject facility here, public in nature, has ceased to exist, whereas the private facilities in *Reitman,* by their very identity and nature, of necessity continued to exist. The possibility that private pool owners in Jackson may operate segregated pools henceforth does not indicate any such state involvement in the past, present or future as could possibly require the application of the *Reitman* principles here.

In *Griffin,* the Court held as a violation of the equal protection clause the closing of all of the public schools of Prince Edward County, Virginia. The Court predicated its decision on two factors. Noting that none of the other counties in Virginia had closed their

---

8. Reynolds v. Sims, 1964, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506.

9. Brown v. Board of Education, 1954, 347 U.S. 483, 74 S.Ct. 686; Shuttlesworth v. Birmingham Board of Education, N.D. Ala.1958, 162 F.Supp. 372, 379, 381, aff'd, 358 U.S. 101, 79 S.Ct. 221, 3 L. Ed.2d 145..

10. Arguments related to a due process or impairment of contract theory were foreclosed to plaintiffs by such cases as Hunter v. Pittsburgh, 1907, 207 U.S. 161, 177, 178, 28 S.Ct. 40, 52 L.Ed. 151. See in this regard, Gomillion v. Lightfoot, 1960, 364 U.S. 339, 342–343, 81 S.Ct. 125, 5 L.Ed.2d 110.

schools,[11] the Court pointed out that the state and county were supporting private, segregated schools with public funds, to the effect that, excluding one temporary expedient, "Prince Edward County school children, if they go to school in their own county, must go to racially segregated schools which, although designated as private, are beneficiaries of county and state support." 377 U.S. at 230–231, 84 S.Ct. at 1233. Pretermitting the question of swimming facilities available in other parts of Mississippi, on which there is no evidence, we see no involvement here of public funds applied to maintain any private swimming facilities.

The plaintiffs rely also on Evans v. Newton, 1966, 382 U.S. 296, 86 S.Ct. 486, but we do not think that case analogous. There the Court found that the public character of a purportedly private park required the park to be treated "as a public institution subject to the command of the Fourteenth Amendment." 382 U.S. at 302, 86 S.Ct. at 490. "We only hold that where the tradition of municipal control had become firmly established, we cannot take judicial notice that the mere substitution of trustees instantly transferred this park from the public to the private sector." 382 U.S. at 301, 86 S.Ct. at 489. In the case at bar, of course, there may well be inferred a "tradition of municipal control," but there the analogy must end. The city swimming pools in Jackson completely ceased to operate, whereas the park in Evans v. Newton continued to operate, with the benefit of continued "municipal maintenance and concern." 382 U.S. at 301, 86 S.Ct. 486.

Appellants have urged a theory other than those suggested explicitly by *Reitman*, *Griffin* and *Evans*. We understood them to argue in terms of a protected right to be a free and equal citizen. We understood counsel in oral argument, as well as by written brief, to state that the issue here is whether the Constitution forbids the City of Jackson from withdrawing a badge of equality. The badge of equality, presumably, was the ability to swim in an integrated municipal swimming pool—the ability to enjoy, in an integrated fashion, recreational facilities operated by a municipality for its citizens. It cannot be disputed that were the badge of equality, here the ability to swim in an unsegregated pool, to be replaced by a badge implying inequality—segregated pools, the municipality's action could not be allowed. However, where the facilities around which revolve the status of equality are removed from the use and enjoyment of the entire community, we see no withdrawal of any badge of equality.

Plaintiffs extend their argument, however, urging that white people in general are more affluent and thus have greater access to private swimming facilities.[12] Therein, it is said, lies a fatal aspect of the alleged removal of the badge of equality—plaintiffs, and the class they represent, will continue to suffer unequal treatment as a result of municipal action. In this context, the argument carries little legal significance. The equal protection clause does not promise or guarantee economic or financial equality. In applying the requirements of the equal protection clause, this

11. On this point, Mr. Justice Black observed that "the Equal Protection Clause relates to equal protection of the laws 'between persons as such rather than between areas'," 377 U.S. at 230, 84 S.Ct. at 1233, but that Virginia law treated "the school children of Prince Edward [County] differently from the way it treats the school children of all other Virginia counties." Id.

12. One pool formerly leased by the City has subsequently been operated by the local Y.M.C.A. on a white-only basis. There is no evidence however, of any public involvement in the operation of that pool. See, e. g., Evans v. Newton, 1966, 382 U.S. 299, 302, 86 S.Ct. 486, citing Terry v. Adams, 1953, 345 U.S. 461, 73 S.Ct. 809; Public Utilities Com'n of District of Columbia v. Pollak, 1952, 343 U.S. 451, 72 S.Ct. 813; Marsh v. Alabama, 1946, 326 U.S. 501, 66 S.Ct. 276.

Court cannot require a city to operate a public swimming pool solely because the city's ceasing to do so forecloses the enjoyment by financially less fortunate citizens of recreational facilities available on a completely private basis to the more affluent.

■■ Motive behind a municipal or a legislative action may be examined where the action potentially interferes with or embodies a denial of constitutionally protected rights. See, *e. g.*, Griffin v. School Board of Prince Edward County, *supra*, and Gomillion v. Lightfoot, *supra*, n. 10. Griffin, *supra*, 377 U.S. at 231, 84 S.Ct. 1226, at 1233, uses the expression that, "Whatever non-racial grounds might support a State's allowing a county to abandon public schools, the object must be a constitutional one, and grounds of race and opposition to desegregation do not qualify as constitutional." That expression must not be lifted out of context. Read in connection with the attached footnote, the preceding part of the paragraph, and the paragraph which follows, it is clear that the Court was speaking of the kind of abandonment of public schools which would operate to continue racial segregation. We do not read this statement to prohibit the City from taking race into consideration if not for an invidious or discriminatory purpose. The consideration of racial factors has been endorsed in cases of national defense,[13] the operation of the public schools,[14] and the selection of jurors.[15] In dismissing this complaint, after considering the affidavits and testimony, the district court found that the City officials acted in the interest of preventing violence and preserving economic soundness to the City's operations. Even though such motive obviously stemmed from racial considerations, we know of no prohibition to bar the City from

taking such factors into account and being guided by conclusions resulting from their consideration.

Motivation has been pointed out here as a positive indication of municipal policy. It has been suggested that the City has, in effect, adopted an official position that it would prefer to operate no pools rather than operate unsegregated pools. Without commenting on the soundness of the argument, we recognize that in the face of the substantial and legitimate objects which motivated the City's closing, to wit, the preservation of order and maintenance of economy in municipal activity, no such municipal policy can be inferred from the closing.

We agree with the district court that plaintiffs were not denied the equal protection of the laws by the closing of these swimming pools.

The judgment is

Affirmed.

JOHN R. BROWN, Chief Judge, and TUTTLE, WISDOM, THORNBERRY, GOLDBERG, and SIMPSON, Judges, dissent, reserving the right to file a dissenting opinion.

GEWIN, COLEMAN, AINSWORTH, GODBOLD and DYER, Judges, concur.

BELL, Circuit Judge, specially concurring, with whom Circuit Judges RIVES, GEWIN, COLEMAN, AINSWORTH, GODBOLD and DYER join.

The footnote at the beginning of the majority opinion shows that Judge Clayton, now deceased, had concurred on February 5, 1968. Now almost two years later, the dissenting opinion has been filed. The pools in question here were closed in 1963. The suit which forms the subject matter of this appeal was filed in 1965. There was a prompt hearing in

13. Hirabayashi v. United States, 1943, 320 U.S. 81, 100, 63 S.Ct. 1375, 87 L.Ed. 1774.

14. Shuttlesworth v. Birmingham Board of Education, *supra*, n. 9; see also Darby v. Daniel, S.D.Miss.1958, 168 F.Supp. 170, 186.

15. Brooks v. Beto, 5 Cir. 1966, 366 F.2d 1, 25.

the district court and the judgment appealed from was rendered in 1965. The original panel decision affirming the denial of relief by the district court was rendered on August 29, 1967. Palmer v. Thompson, 5 Cir., 1967, 391 F.2d 324. This is not to attribute the long delay to the parties; it is court produced. In any event, one must wonder what has happened to the pools in the long interim? Are they still in existence? If so, what condition are they in?

The final footnote [1] of the dissenting opinion shows that the differences between the majority and the dissenters are largely factual. The majority opinion had emphasized that "The only evidence as to the reasons and motives for such closing is contained in affidavits of the Mayor and of the Director of the Department of Parks and Recreation." [Majority typed opinion, p. 1225]. The majority opinion also noted particularly that "all parties agreed that they had 'had an opportunity to offer any and all evidence desired.'" [p. 1225] With deference, it would appear that the dissenting opinion, in making the finding that the City of Jackson acted in bad faith, simply departs from the record.[2] There is no record basis for such a finding.

Whether to operate swimming pools, racial discrimination aside, is a matter for the City of Jackson. We can easily surmise, indeed it may not be disputed, that the closings here were racially motivated. Mere racial motivation, however, is not proof of a racially discriminatory purpose in the closing. The presence or absence of such a purpose was and is the real issue. Courts, including federal courts, must travel on proof and there was a failure of proof in this case on the part of plaintiffs. We cannot assume racial discrimination simply from the fact of the closings. Constitutional principles, as important as they are, must nevertheless rest on facts. It may be that on a full hearing a factual base could be developed for the constitutional principles announced by the dissenting opinion. The case is here, however, on affidavits and the necessary factual basis is absent. I, therefore, concur.

WISDOM, Circuit Judge, dissenting, joined by JOHN R. BROWN, Chief Judge, TUTTLE, THORNBERRY, GOLDBERG and SIMPSON, Circuit Judges.

WISDOM, Circuit Judge, I respectfully dissent:

Long exposure to obvious and non-obvious racial discrimination has seasoned this Court. It is astonishing, therefore, to find that half of the members of this Court accept at face value the two excuses the City of Jackson offered for closing its swimming pools and wading pools. As found by the district court and blessed in the affirming opinion, these excuses are:

"[1]  The personal safety of the citizens of the City and the maintenance of law and order would be endangered by the operation of public swimming pools on an integrated basis.

■   These pools could not be economically operated in that manner."

In Griffin v. County School Board of Prince Edward County, 1964, 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256, the School Board in Prince Edward County, Virginia, motivated by the intention of circumventing a desegregation order, as the City of Jackson was here motivated, closed the public schools in the county. The Supreme Court ordered the schools

---

1. "16 We do not say that a city may never abandon a previously rendered municipal service. If the facts show that the city has acted in good faith for economic or other nonracial reasons, the action would have no overtones of racial degradation, and would therefore not offend the Constitution."

2. Judge Rives wishes it noted that the City of Montgomery parks, contrary to footnote 14 of the dissenting opinion, are open and have been since 1965. This fact was called to the attention of the court by Judge Rives prior to the filing of the dissenting opinion.

reopened. Moreover, the Court instructed the district court that it could require the County Supervisors to take the affirmative action of levying taxes to raise funds adequate to reopen and maintain the public school system. There are manifest factual differences between *Griffin* and the case before this Court: public schools in other Virginia counties stayed open; here, all municipal pools in Jackson were closed, although all other municipal recreational facilities were available on a desegregated basis. And there is a difference in the degree of essentiality between public school education and public recreational facilities—although no one today can deny that a city owes an obligation to its citizens to provide reasonably adequate recreational facilities.[1] But the rationale on which *Griffin* rests applies here:

> Whatever nonracial grounds might support a State's allowing a county to abandon public schools, the object must be a constitutional one, and grounds of race and opposition to desegregation do not qualify as constitutional. 377 U.S. at 231, 84 S.Ct. at 1233.

## I.

A. Over fifty years ago, the Supreme Court demolished an excuse similar to the first excuse the City advances here. In Buchanan v. Warley, 1917, 245 U.S. 60, 38 S.Ct. 16, 62 L.Ed. 149, the Court invalidated an ordinance of the City of Louisville prohibiting Negroes from occupying houses in blocks where the greater number of houses were occupied by whites, and vice versa. The City urged that the ordinance "will promote the public peace by preventing race conflicts". The Court dismissed this argument with a single sentence: "Desirable as this is, and important as is the preservation of the public peace, this aim cannot be accomplished by laws

or ordinances which deny rights created or protected by the federal Constitution." Over fifteen years ago, in the second *Brown*[2] decision, the Supreme Court declared: "[It] should go without saying that the vitality of these constitutional principles cannot be allowed to yield simply because of disagreement with them." 349 U.S. at 300, 75 S.Ct. at 756. Over ten years ago, the Court dealt with a similar argument in the Little Rock school case, Cooper v. Aaron, 1958, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5. After quoting Buchanan v. Warley, the Court said: "Thus law and order are not here to be preserved by depriving the Negro children of their constitutional rights." In Watson v. City of Memphis, 1963, 373 U.S. 526, 83 S.Ct. 1314, 10 L.Ed.2d 529, the City of Memphis sought to defend a gradual planned transition from segregated to integrated park facilities by asserting that it was necessary "to prevent interracial disturbances, violence, riots, and community confusion and turmoil," 373 U.S. at 535, 83 S.Ct. at 1319. For a unanimous Court, Mr. Justice Goldberg met this contention by asserting that the "compelling answer * * * is that constitutional rights may not be denied simply because of hostility to their assertion or exercise." Id.

In Cooper v. Aaron the district court found that there was "extreme public hostility" and that there were numerous acts of violence and disorder caused by opposition to desegregation of the schools in Little Rock. Here, there is no past history, only speculation rebutted by the existence of desegregated pools in southern cities.[3] The City of Jackson's operation of other public recreational facilities on a desegregated basis indicates that the city's law enforcement officers are able to preserve peace and that the pools were closed not to promote peace but to prevent blacks and whites swimming in the same water.

1. *See* Evans v. Newton, 1966, 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 45.

2. 1955, 349 U.S. 294, 75 St.Ct. 753, 99 L.Ed. 1083.

3. As the Court knows, in some cities such as Tallahassee and New Orleans, pools that had been closed have now been reopened.

**B.** The second reason the City asserts for closing the pools is that "these pools could not be economically operated" on an integrated basis. At about the same time the City closed its pools, it did away with public rest rooms in the Municipal Court Building and removed the benches and tables from the Livingston Park Zoo. We are told in Mayor Thompson's affidavit, "The public rest rooms are not maintained in the Municipal Court Building for the reason that the efficient operation of said building does not permit the furnishing of these facilities for the general public". Perhaps we are also supposed to believe that benches in Livingston Park were also removed for reasons of economy and efficiency.

A study of the record shows that Jackson, like all cities, does not expect its swimming pools, wading pools, and park benches to be maintained profitably as if each recreational facility were a business independent of the facilities and activities a municipal park offers its citizens.

The Department of Parks and Recreation operates all of the parks and playgrounds in the City of Jackson. The parks have such facilities as swimming pools, wading pools, "kiddie rides", baseball diamonds, tennis courts, and similar attractions. The Department also operates the Municipal Auditorium, College Park (Negro) Auditorium, Community Centers, Municipal golf courses (including a nine-hole *Negro* golf course), Livingston Lake, city concessions, and the City Zoo. As is evident from the affidavit of George Kurts, Director of the Department, and from his itemized list of the numerous activities and facilities the Department maintains, few, if any, of the recreational activities could have been self-supporting.

For several years the pools for whites in Livingston, Battlefield Park, and College Park and the pool for Negroes in College Park had expenses of $10,000 each against revenues of $8000 each for the white pools and $2500 for the Negro pool. In short, the pools had never been operated economically on a segregated basis; nor were the wading pools or park benches. The City charged swimming fees of only ten cents and twenty cents, described by the Director as the "lowest to be found in the country * * in order to serve as many people as possible."

The swimming pools and wading pools, like benches in Livingston Park, are parts of a large recreation package. In Jackson the operating funds for the Department of Parks and Recreation come from a one mill levy and from revenue derived from certain operations such as auditorium receipts, pool and lake admissions, golf fees, concessions, kiddie rides, vending machines, and special events. And, as the Director said, "From the General Fund is appropriated supplementary money needed to meet the overall operation of Parks and Recreation".

The district court found that the "City of Jackson closed all swimming pools owned and operated by it in 1963, following the entry of a declaratory judgment [of that] court in the case of Clark v. Thompson, 206 F.Supp. 539 requiring integration of the City's swimming and wading pools". This Court affirmed that decision, 313 F.2d 637, and in April 1963 denied a rehearing. May 27, 1963, a committee, representing the Negro community in Jackson, met with Mayor Thompson and other city officials to present their grievances, including a request that the City desegregate its public facilities including parks and swimming pools. According to the uncontradicted affidavit of one of the Negroes present, Mayor Thompson declared that the public policy of the City of Jackson was to continue segregation of the races in the use and operation of city facilities. May 30, 1963, the Jackson Daily News reported Mayor Thompson as having announced, "Public swimming pools would not be opened on schedule this year due to some minor water difficulty". "Minor water difficulty" has disappeared as an excuse for the City's not having opened its pools in 1963 or since. The pools are still closed, except for the

pool at Leavell Woods Park. They are being properly maintained,—without any off-setting revenues—or were in August 1965, according to Director Kurts.

The Leavell Woods Pool, unlike the other pools, had been leased by the City. Early in 1964 the City cancelled its lease on this pool. The Young Men's Christian Association promptly took over the leasehold and has since operated the pool exclusively for white patrons.

C. The excuse that integrated pools would pose a threat to law and order may have resulted from an honest fear held by the Jackson City Fathers. But this fear does not justify yielding to the community hostility that produces it. Yielding puts a premium on violence, disorder, and further community resistance.

The excuse that the City of Jackson closed its swimming and wading pools because they could not be operated profitably is frivolous.

The City's action in closing its pools must stand or fall on a city's right to close a recreational facility on the "grounds of race and opposition to desegregation".

## II.

A. My affirming brothers could not have been entirely satisfied with the reasons the City put forth for closing the swimming pools and wading ponds. They rely heavily, as did the district court, on the argument that the act operated equally on Negroes and whites. They say:

> "It cannot be disputed that were the badge of equality, here the ability to swim in an unsegregated pool, to be replaced by a badge implying inequality—segregated pools, the municipality's action could not be allowed. However, where the facilities around which revolve the status of equality are removed from the use and enjoyment of the entire community, we see no withdrawal of any badge of equality."

This is a tired contention, one that has been overworked in civil rights cases. In *Griffin* the public school facilities of Prince Edward County were "removed from the use and enjoyment of the entire community". There too the public officials argued that tuition grants, as well as closing the schools, applied equally to Negroes and whites. Nevertheless the Supreme Court held that this retreat from the operation of a public facility could not be justified on grounds of race and opposition to desegregation.

In Loving v. Virginia, 1967, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010, the State argued that its miscegenation statutes punish equally both the Negro and white participants in an interracial marriage. The Supreme Court "reject[ed] the notion that the mere 'equal application' of a statute containing racial classifications is enough to remove the classification from the Fourteenth Amendment's proscription of all invidious racial discrimination". In Anderson v. Martin, 1963, 375 U.S. 399, 84 S.Ct. 454, 11 L.Ed. 2d 430, the State defended a statute requiring that in all elections the nomination papers and ballots should designate the race of candidates. The State argued that the Act was "nondiscriminatory because the labeling provision applies equally to Negro and white". The Court held that in fact the State was attempting to encourage its citizens to vote for a candidate solely on the ground of race. "Race is the factor upon which the statute operates and its involvement promotes the ultimate discrimination which is sufficient to make it invalid." In Hamm v. Virginia State Board of Elections, E.D.Va.1964, 230 F.Supp. 156, aff'd Tancil v. Woolls, 379 U.S. 19, 85 S.Ct. 157, 13 L.Ed.2d 91 (1964), the Virginia law under attack required that lists of voters and property tax assessments be kept separately for each race. The Negroes attacking the statutes demonstrated no measurable inequality or discriminatory effect. Nonetheless the Court summarily affirmed the district court's holding the law unconstitutional.

In cases such as Loving v. Virginia, Anderson v. Martin, and *Hamm*, the statute may have applied equally to Negroes and whites but that fact was ir-

relevant because race was the factor upon which the statute operated, just as race was the factor that led the City of Jackson to close its pools.

Measurable inequality was not the basis for the Supreme Court's per curiam decisions that applied *Brown* to public parks [4] and beaches,[5] municipal theatres [6] and golf courses,[7] busses [8] and courtrooms.[9] In these cases the central vice in the unlawful state action was the forced display of a racial badge of inferiority. As the first Justice Harlan put it: "[Segregation statutes] in fact proceed on the ground that colored citizens are so inferior and degraded that they cannot be allowed to sit in public coaches occupied by white citizens * * *." [10] Just as certainly as did the Jim Crow law considered in Plessy v. Ferguson, the swimming pool closing proceeds on the ground that Negroes are "so inferior and degraded that they cannot be allowed" to use public swimming pools with white people.

In this case, however, and in *Griffin* the equal application argument rests on the fallacious assumption that closing a public facility has the same effect on both Negroes and whites. Closing the schools in Prince Edward County had a conspicuously greater effect on Negro children than on white children. As Justice Black said:

> Closing Prince Edward's schools bears more heavily on Negro children in Prince Edward County since white children there have accredited private schools which they can attend, while colored children until very recently have had no available private schools, and even the school they now attend

is a temporary expedient. (377 U.S. at 230, 84 S.Ct. at 1233).

Here too closing the pools in Jackson "bears more heavily on Negro children". Many white children in Jackson have the opportunity of swimming in country club pools or in pools owned by private persons or in pools operated at summer camps; all may swim in the Leavell Woods Pool. Few, if any, Negroes in Jackson have access to a swimming pool.

In Hall v. St. Helena Parish School Board, E.D.La.1961, 197 F.Supp. 649, 655, aff'd 368 U.S. 515, 82 S.Ct. 529, 7 L.Ed.2d 521 (1962), the court said:

> 'to speak of this law [closing the schools and providing tuition grants for students attending private schools] as operating equally is to equate equal protection with the equality Anatole France spoke of: "The law, in its majestic equality, forbids the rich as well as the poor to sleep under bridges, to beg in the streets, and to steal bread." [11]

B. The affirming opinion dismisses the subject of the Leavell Woods Community Park pool with the brief statement in a footnote that "There is no evidence, however, of any public involvement in the operation of that pool". After the city cancelled its lease of the pool the Negroes in Jackson suffered the humiliation of seeing the Young Men's Christian Association operate the pool for whites only. This is exactly the kind of badge of inferiority my brothers refer to as impermissible. The City's withdrawal from performing a recreational function in favor of a private, segregated operation of the same fa-

---

4. New Orleans City Park Development Ass'n v. Detiege, 1958, 358 U.S. 54, 79 S.Ct. 99, 3 L.Ed.2d 46.

5. Dawson v. Mayor and City Council of Baltimore City, 1955, 350 U.S. 877, 76 S.Ct. 133, 100 L.Ed. 774.

6. Muir v. Louisville Park Theatrical Ass'n, 1954, 347 U.S. 971, 74 S.Ct. 783, 98 L.Ed. 1112; Schiro v. Bynum, 1964, 375 U.S. 395, 84 S.Ct. 452, 11 L.Ed.2d 412.

7. Holmes v. City of Atlanta, 1955, 350 U.S. 879, 76 S.Ct. 141, 100 L.Ed. 776.

8. Gayle v. Browder, 1956, 352 U.S. 903, 77 S.Ct. 145, 1 L.Ed.2d 114.

9. Johnson v. Virginia, 1963, 373 U.S. 61, 83 S.Ct. 1053, 10 L.Ed.2d 195.

10. Plessy v. Ferguson, 1896, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256.

11. Anatole France, Le Lys Rouge, Ch. VII (1894).

cility is similar to the state's involvement in private discrimination condemned in Burton v. Wilmington Parking Authority, 1961, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45. In *Burton* the Supreme Court found that the State of Delaware had elected to place its power and prestige behind the admitted discrimination against Negroes by a private restaurant in a state-owned building.

### III.

We turn now to the decisions which support the plaintiffs' position.

"[A]cts generally lawful may become unlawful when done to accomplish an illegal end and a constitutional power can not be used by way of condition to attain an unconstitutional result." Western Union Telegraph Co. v. Foster, 1918, 247 U.S. 105, 38 S.Ct. 438, 62 L.Ed. 1006. When, as in this case, a city closes a public facility for the purpose of avoiding a desegregation order and when the necessary effect of the city's retreat or withdrawal is to discriminate against Negroes the otherwise lawful closure becomes unlawful.[12]

In Evans v. Newton, 1966, 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373, the City of Macon, Georgia, was trustee for Bacon's Park, a park open only to white persons. The Court held that the City could not resign as trustee, abandoning the park as a public activity, to avoid integration. "A park * * * is more like a fire department or police department that traditionally serves the community." 382 U.S. at 302, 86 S.Ct. at 490. *Evans* is not distinguishable from the instant case. Considering the parks as a whole or the public recreational activities as a package, the City of Jackson should no more be allowed to abandon one phase of public recreation to avoid desegregation than the City of Macon was allowed to turn over Bacon's Park to private trustees. As the Court noted, "Mass recreation through the use of private parks is plainly in the public domain."[13] 382 U.S. at 302, 86 S.Ct. at 490. Bacon's Park in Macon would have ceased to exist too, as far as the City was concerned and as far as Negroes could use it, but for the Court's decision refusing to allow the City to retreat from its responsibility.

The Girard College case is another example of the principle that a city cannot by retreating avoid desegregating a facility. In Commonwealth of Pennsylvania v. Board of Directors of City

---

12. The City's argument fails to take account of the crucial distinction between the state's failure to institute a new service and its abandonment of a service it formerly provided. There are many things a state chooses not to do. When a state simply does not create one new program, or another, there is no change in the status quo. There is not "action" which could have a discriminatory impact. But when a state discontinues an existing service, clearly there is "action", and the action may well be a vehicle for discrimination. Practical as well as theoretical considerations dictate a distinction between the failure to establish a service and the abandonment of an existing one. Most important is the impact on the individual citizens. When a service has never existed there is no action to bring the state's animus home to those against whom it is directed. There is nothing to focus a generalized discriminatory atmosphere into a stinging rebuke. The impact is naturally much sharper when the state expresses its animus by taking away a previously enjoyed privilege. Then the state's discrimination is concentrated in an identifiable act. The rebuke is felt.

From the viewpoint of the city, also, it is more practical for a court to forbid the abandonment of a service than to order its original establishment. In the former case, facilities already exist, policies have been formulated, and the city already has an operative system of administration. In the latter case, the entire program must be constructed. Finally, it is more consonant with the traditional function of courts to enjoin abandonment than order a city to create and adopt an entirely new program.

In Gomillion v. Lightfoot, for example, the Court based its decision, at least in part, on the ground that the Alabama gerrymander deprived the Negro plaintiffs of something they had previously enjoyed—their "pre-existing municipal vote". 364 U.S. at 341, 81 S.Ct. 125.

13. Citing Watson v. Memphis, 373 U.S. 526, 83 S.Ct. 1314, 10 L.Ed.2d 529.

Trusts of the City of Philadelphia, 1957, 353 U.S. 230, 77 S.Ct. 806, 1 L.Ed.2d 792, the Supreme Court held that Girard College, regardless of the language of the trust limiting students to white students, should be desegregated. The Orphans' Court of Pennsylvania removed the City of Philadelphia as trustee and installed private persons as trustees. The Court of Appeals held that the state could not withdraw; the appointment of private trustees to continue operation of the college was unconstitutional state action. Commonwealth of Pennsylvania v. Brown, 3 Cir. 1968, 392 F.2d 120, 25 A.L.R.3d 724.

Thus in both these cases, as in the instant case, the city government tried to escape desegregating a facility by terminating the city's connection with the facility. The only difference here is that the method used to accomplish the objective was closing the pools rather than withdrawing as trustee. But it is just as wrong to close public facilities for racial reasons as it is to operate them on a racial basis. In each case race is the dominant factor guiding the decision.

In Reitman v. Mulkey, 1967, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830, the Supreme Court affirmed a California decision holding unconstitutional an amendment to the California Constitution, approved by the voters, repealing existing open housing laws and forbidding the State's interfering in the future with the absolute right of any person to sell or lease his property to any person. The amendment was neutral on its face and could be said to operate equally on Negroes and whites. The Court held that the amendment was discriminatory; that "even where the State can be charged only with encouraging rather than commanding discrimination", there was prohibited state involvement.

To find state discrimination the Court used the "three factor test" which the California Supreme Court enunciated: (1) "The historical context and the conditions existing prior to its enactment", (2) its "immediate objective", that is, its "immediate design and intent", and (3) its "ultimate effect". Applying the first factor, this Court is so familiar with the historical context and the conditions existing in Mississippi at the time the Jackson pools were closed that it is necessary only to quote from a case we decided in May 1963: "We again take judicial notice that the State of Mississippi has a steel-hard, inflexible, undeviating, official policy of segregation." United States v. City of Jackson, 5 Cir. 1963, 318 F.2d 1. Second, the immediate objective in closing the public pools was to avoid complying with the desegregation order issued in Clark v. Thompson. Third, for white persons the first effect of closing the pools was to encourage private enterprise to supply segregated pools for white patrons. For Negroes the first effect was punitive: they were denied the opportunity of using even their segregated pool. The ultimate effect is to encourage segregation to the detriment of Negroes. All public recreational facilities are now in jeopardy.

In Hunter v. Erickson, 1969, 393 U.S. 385, 89 S.Ct. 557, 21 L.Ed.2d 616, the City of Akron, Ohio, amended its charter to prevent the city council enacting any ordinance dealing with racial, religious, or ancestral discrimination in housing without the approval of a majority of voters. The Court found that this was a denial of equal protection in that "Only laws to end housing discrimination based on 'race, color, religion, national origin or ancestry' must run § 137's gauntlet." There again the City argued that all groups were treated equally. The Court said, "Moreover, although the law on its face treats Negro and white, Jew and gentile in an identical manner, the reality is that the law's impact falls on the minority." Thus, as in *Reitman* the court regarded the actual impact on minority groups as controlling rather than the apparent neutrality of the law.

Federal courts are used to comparable situations in the field of labor law. Time and again this Court has had to determine whether an employee was dis-

charged for good reason, for no reason, or on account of the employee's labor union activity. In Textile Workers of America v. Darlington Manufacturing Company, 1965, 380 U.S. 263, 85 S.Ct. 994, 13 L.Ed.2d 827, the defendants owned several plants, in one of which employees sought to organize for collective bargaining. The defendants closed the plant in question shortly after the employees voted in favor of unionization. The Supreme Court remanded the case to the NLRB for a factual determination of the purpose and effect of closing the plant. The company could go out of business entirely, but closing one plant was an unfair labor practice, if motivated by a purpose to chill unionism in any of the remaining plants. Here there can be no doubt of the chilling effect the closing of Jackson's pools had on the Negroes who presented their grievances to Mayor Thompson and on all Negroes using the parks and other public facilities. Negroes in Jackson are now on notice that a petition to redress grievances may lead to a change for the worse.

Gomillion v. Lightfoot, 1960, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110, involved another situation where the factual effect of racially motivated action was determinative of unconstitutionality. The Alabama legislature had redrawn the boundaries of the City of Tuskegee to exclude most of the Negro voters. The legislature has broad authority to fix and from time to time alter municipal borders. But state authority is not insulated from judicial control "when state power is used as an instrument for circumventing a federally protected right". 364 U.S. at 347, 81 S.Ct. at 130. In many cases, said Justice Frankfurter, the Court has "prohibited a State from exploiting a power acknowledged to be absolute in an isolated context". The Court held that the Fifteenth Amendment negated the state's power to redraw boundaries that did away with the Negroes' pre-existing right to vote in municipal elections.

\* \* \* \* \* \*

The closing of the City's pools has done more than deprive a few thousand Negroes of the pleasures of swimming. It has taught Jackson's Negroes a lesson: In Jackson the price of protest is high. Negroes there now know that they risk losing even segregated public facilities if they dare to protest segregation. Negroes will now think twice before protesting segregated public parks, segregated public libraries, or other segregated facilities. They must first decide whether they wish to risk living without the facility altogether, and at the same time engendering further animosity from a white community which has lost its public facilities also through the Negroes' attempts to desegregate these facilities.

The long-range effects are manifold and far-reaching. If the City's pools may be eliminated from the public domain, parks,[14] athletic activities, and libraries also may be closed. No one can say how many other cities may also close their pools or other public facilities. The City's action tends to separate the races, encourage private discrimination, and raise substantial obstacles for Negroes asserting the rights of national citizenship created by the Wartime Amendments.

We should not be misled by the equal-application argument. That argument smacks of the repudiated separate-but-equal doctrine of Plessy v. Ferguson. We should not be misled by focusing on the city's non-operation of the pools. Closing the pools as an official act to prevent Negroes from enjoying equal status with whites constituted the unlawful state action. It had the same pur-

---

14. The City of Montgomery closed its parks January 1, 1959. They are still closed. A panel of this Court held that it was "a matter committed to the wisdom of the members of the Board of Commissioners and is not subject to review by the Court in the absence of some violation of the Constitution of the United States." City of Montgomery v. Gilmore, 5 Cir. 1960, 277 F.2d 364.

pose and many of the same effects as maintaining separate pools.

We should recognize the actual traumatic impact of the action on Negroes for what it was. It was a reaffirmation of the *Dred Scott* article of faith that Negroes are indeed "a subordinate or inferior class of beings, who had been subjugated by the dominant race" and are not members of the "people of the United States".[15] This is the badge of servitude, the sign of second-class citizenship, the stigma that the Thirteenth, Fourteenth, and Fifteenth Amendments were designed to eradicate.[16]

### ADDENDUM

I err in saying that the public parks in Montgomery, which the City closed in 1959, are still closed. See footnote 2 of Judge Bell's opinion. As a matter of fact, since 1965 anyone may enjoy the trees, the flowers, the scenic beauty of the parks. But visitors to Montgomery's parks will find no animals in the City Zoo and no water in the public swimming pools.

---

15. Dred Scott v. Sanford, 1857, 60 U.S. (19 How.) 393, 15 L.Ed. 691.

16. We do not say that a city may never abandon a previously rendered municipal service. If the facts show that the city has acted in good faith for economic or other nonracial reasons, the action would have no overtones of racial degradation, and would therefore not offend the Constitution.