Rebecca **WRIGHT** et al., Plaintiffs-Appellants,

v.

The **CITY OF BRIGHTON, ALABAMA,** et al., Defendants-Appellees.

No. 29262.

United States Court of Appeals,
Fifth Circuit.

March 16, 1971.

Rehearing Denied and Rehearing En Banc Denied May 4, June 8, 1971.

David H. Hood, Jr., Bessemar, Ala., Jack Greenberg, Norman Amaker, James M. Nabrit, III, New York City, Demetrius C. Newton, Birmingham, Ala., for plaintiffs-appellants.

Norman K. Brown, Bessemar, Ala., Hugh Locke, Birmingham, Ala., for defendants-appellees.

Before THORNBERRY, GOLDBERG, and AINSWORTH, Circuit Judges.

GOLDBERG, Circuit Judge:

This case brings us to Brighton, a city in Jefferson County, Alabama, which is sited in the mainstream of the jurisprudential history of school desegregation.[1] The immediate problem involves the sale of an abandoned school building by the City of Brighton, Alabama, to the Hoover Academy, a private all-white school. The plaintiffs, black citizens of Brighton, seek to have us enjoin the sale under 28 U.S.C.A. §§ 1343(3), (4), 42 U.S.C.A. §§ 1981, 1983, and the Fourteenth Amendment, contending that the sale of the building violated their right to equal protection of the laws.

The building in question, the Brighton Junior High School, was purchased by the city in 1966 from the Jefferson County Board of Education when that Board decided to abandon the building as a part of the county school system. The building remained vacant and unused following its purchase by the city, and school facilities were furnished elsewhere for the children of Brighton by the Jefferson County Board of Education. In July of 1969, three years after the city purchased the building, two black councilmen proposed to the city council that the building be used to house certain welfare programs. Parliamentary frustrations and other maneuvers stymied this suggestion and the proposal was tabled. Shortly thereafter the council was informed that the Hoover Academy was interested in leasing the building. The council then voted to reject the earlier proposal to use the building for welfare programs, and authorized the mayor to negotiate a lease with the Hoover Academy. On August 12, 1969, the council passed an ordinance authorizing the mayor to lease the building to Hoover Academy for two years with an option to buy or renew the lease at the end of that period.

On August 27, 1969, the plaintiffs filed a complaint in the federal district court against the city and Hoover Academy, seeking to enjoin the city from leasing or selling the building to the Academy. At a preliminary hearing the court indicated that a *lease* by the city to a private segregated school would probably fall within the proscriptions of

---

1. See Stout v. Jefferson County Board of Education, 5 Cir. 1970, 419 F.2d 1211; United States v. Jefferson County Board of Education; 5 Cir. 1969, 417 F.2d 834; United States v. Jefferson County Board of Education, 5 Cir. 1968, 396 F.2d 44; United States v. Jefferson County Board of Education, 5 Cir. 1967, 380 F.2d 385; United States v. Jefferson County Board of Education, 5 Cir. 1966, 372 F.2d 836, cert. denied, Caddo Parish School Board v. United States, 389 U.S. 840, 88 S.Ct. 67, 19 L.Ed.2d 103; United States v. Jefferson County Board of Education, 5 Cir. 1965, 349 F.2d 1021.

Burton v. Wilmington Parking Authority, 1961, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45, and our opinion in Hampton v. City of Jacksonville, Florida, 5 Cir. 1962, 304 F.2d 320, cert. denied, Ghioto v. Hampton, 371 U.S. 911, 83 S.Ct. 256, 9 L.Ed.2d 170.

The Hoover Academy then proposed to accelerate its option to purchase the building. The property was appraised by three appraisers, two estimating the value of the building at $12,000 and a third fixing the amount at $12,500. Following these appraisals Hoover Academy submitted a bid to purchase the property for $12,500, payable $500 upon delivery of the deed, $500 thirty days later, and the balance at $100 per month with six percent interest on the unpaid principal, which was to be secured by a mortgage on the building. At a special meeting of the city council on September 8, 1969, the council voted to authorize the immediate sale of the building to Hoover Academy on these terms. The next day the Mayor executed a deed to the building and received from Hoover Academy a purchase money mortgage.

The plaintiffs' suit continued now as an action to enjoin the sale of the building to the Hoover Academy. The district court, citing our opinion in Derrington v. Plummer, 5 Cir., 1956, 240 F. 2d 922, cert. denied, 353 U.S. 924, 77 S. Ct. 680, 1 L.Ed.2d 719, held that the sale of the building to Hoover Academy did not violate any rights of plaintiffs or of members of their class and denied the requested relief. Plaintiffs appeal from that decision, and we reverse.

Defendant Hoover Academy claims at the outset that there is no discrimination in the operation of Hoover, and that none of the plaintiffs or members of their class have ever been denied admission to that institution. We find this contention of little merit. Hoover Academy was incorporated in 1963, and it has been "lily white" from its natal day. The district court found, and we think the evidence supports this determination, that "it is the policy of the school to accept only white students." The question, therefore, is whether it was a denial of plaintiffs' constitutional rights for the city to sell a public school building to a private school which discriminates against persons of plaintiffs' class in its admission policies.

The defendants, both the city and the academy, have approached this question in a like manner, seeking to show that there is insufficient city involvement in the operation of the school to attribute the academy's discriminatory admission policies to the city. It is true that in those cases where state involvement in an ostensibly private enterprise was deemed sufficient to make the otherwise private discrimination state action, more involvement or control was exercised by the state entity than we find here. In Burton v. Wilmington Parking Authority, *supra*, the Supreme Court found state involvement in the discriminatory operation of a restaurant by the state's lessee because among other facts (1) the land and building were publicly owned; (2) the leased premises constituted an indispensable part of the state's plan to operate a self-sustaining parking project; (3) the state maintained the building with public funds; and (4) the lessee enjoyed a tax exempt status. In short, the court found that the mutual benefits flowing to and from the state and the lessee indicated that the degree of state participation and involvement was sufficient to make the discriminatory operation of the restaurant state action and therefore forbidden by the Fourteenth Amendment. Here, the defendants point out that the operation of the school bears no such relationship to the public authority. There is, they assert, no public building involved, no continuing public function co-existent in the same building, and no funds from the public authority contributed for maintenance and upkeep. They argue that because this was the sale of an entire building, and not the lease of one part of a public building, all connections were severed and no state involvement remains in the operation of the Hoover

Academy. Defendants further assert that there is no retained interest or control over the vendee's use of the land, a fact which this court found rendered the discriminatory operation of a golf course state action in Hampton v. City of Jacksonville, Florida, *supra*. In *Hampton* the city sold the municipal golf courses to private owners, but retained a possibility of reverter, which would have caused the land to revert to the city if the buyers had ever used it for a purpose other than a golf course. This reservation of control we found was sufficient to involve the city in the white-only policy of the course and to convert what would otherwise have been purely private action into discrimination by the state. *See also* Wimbish v. Pinellas County, Florida, 5 Cir. 1965, 342 F.2d 804. The defendants compare the present case and of course find no such reservation of control. They conclude that there is no involvement of the city with the running or operation of Hoover Academy, and that the plaintiffs therefore have been denied no constitutional right.

While we agree with defendants that no prior case of this court or any other court has found state involvement in the operation of a facility on the basis of facts here presented, we do not necessarily agree that the amount of involvement between the City of Brighton and the operation of the Hoover Academy is insufficient to find that the operation of the academy is state action.[2] However, we do not find it necessary to decide this point. The plaintiffs did not sue to compel the integrated operation of Hoover Academy. Rather, they sued to enjoin the sale of the building to Hoover Academy. The plaintiffs do not claim that the academy's discriminatory policies are a denial of their equal rights.

The plaintiffs instead complain that the sale by the city to a party that the city knew had a policy of racial discrimination was a violation of their constitutional rights. Thus, it is the sale alone, not the city's involvement in the operation of the academy, which is in question here, and it is clear beyond peradventure that the sale itself was state action. The question is whether this sale violated plaintiffs' constitutional rights. We think that it did.

█ The law is settled that no matter how neutral a piece of legislation or official action appears on its face, if its practical effect is to place a burden on one racial group, then such a burden constitutes a denial of equal protection. In Hunter v. Erickson, 1969, 393 U.S. 385, 89 S.Ct. 557, 21 L.Ed.2d 616, the Supreme Court explained:

"Moreover, although the law on its face treats Negro and white, Jew and gentile in an identical manner, the reality is that the law's impact falls on the minority. The majority needs no protection against discrimination and if it did, a referendum might be bothersome but no more than that. Like the law requiring specification of candidates' race on the ballot, Anderson v. Martin, 375 U.S. 399, 84 S.Ct. 454, 11 L.Ed.2d 430 (1964), § 137 places special burdens on racial minorities within the governmental process. This is no more permissible than denying them the vote, on an equal basis with others." 393 U.S. at 391, 89 S. Ct. at 560.

This principle has been recognized in numerous cases. In Reitman v. Mulkey, 1967, 387 U.S. 369, 87 S.Ct. 1627, 18 L. Ed.2d 830, the Court was concerned with the California constitutional provisions forbidding the state from denying any person the right to decline to sell or rent

---

2. Were we compelled to decide this question we would find it significant that the financing arrangement made between the city and Hoover Academy was extremely favorable to the academy and provided an ongoing relationship between the two. Certainly the interest provisions were more favorable than those which could have been obtained in an arms length transaction with a financing institution. See Hampton v. City of Jacksonville, Florida, 5 Cir. 1962, 304 F.2d 320, where we noticed the favorable terms of the sale but did not base our opinion on that fact.

his residential property to such persons as he chooses. In deciding that the provision was a violation of the Fourteenth Amendment because its ultimate effect was to burden a racial minority by encouraging racial discrimination, the Court had this to say:

"None of these cases squarely controls the case we now have before us. But they do illustrate the range of situations in which discriminatory state action had been identified. They do exemplify the necessity for a court to assess the potential impact of official action in determining whether the State has significantly involved itself with invidious discriminations. Here we are dealing with a provision which does not just repeal an existing law forbidding private racial discriminations. Section 26 was intended to authorize, and does authorize, racial discrimination in the housing market. The right to discriminate is now one of the basic policies of the State. The California Supreme Court believes that the section will significantly encourage and involve the State in private discriminations. We have been presented with no persuasive considerations indicating that these judgments should be overturned." 387 U.S. at 380, 87 S.Ct. at 1634.

*See also* Anderson v. Martin, 1964, 375 U.S. 399, 84 S.Ct. 454, 11 L.Ed.2d 430; Arrington v. City of Fairfield, Alabama, 5 Cir. 1969, 414 F.2d 687; Norwalk Core v. Norwalk Redevelopment Agency, 2 Cir. 1968, 395 F.2d 920; Kennedy Park Homes Ass'n. v. City of Lackawanna, W.D.N.Y.1970, 318 F.Supp. 669; and Valtierra v. Housing Authority of City of San Jose, N.D.Calif.1970, 313 F.Supp. 1, probable jurisdiction noted, James v. Valtierra, 398 U.S. 949, 90 S.Ct. 1873, 26 L.Ed.2d 288, Shaffer v. Valtierra, 399 U.S. 925, 90 S.Ct. 2247, 26 L.Ed.2d 790.

Here it is perfectly clear that the City of Brighton's determination to sell a public school building to an institution which the city knew would operate an all-white segregated school had the ultimate effect of placing a special burden on the black citizens of that community. The city in effect encouraged the maintenance of a segregated facility by its action. It participated in a transaction by which a public building, once open to all on an equal basis, was converted into a segregated facility where the black people of the community were no longer welcome. Whether we call such action the creation of a badge of slavery, Jones v. Alfred H. Mayer Co., 1968, 392 U.S. 409, 439, 88 S.Ct. 2186, 20 L.Ed.2d 1189, a relic of slavery, Jones v. Alfred H. Mayer Co., *supra*, at 443, 88 S.Ct. 2186, or a badge of inequality, Palmer v. Thompson, 5 Cir. 1969, 419 F.2d 1222, cert. granted, 400 U.S. 811, 91 S.Ct. 32, 27 L.Ed.2d 41, such a segregated institution is one of the many humiliations which society has visited upon the black man. The Supreme Court and others have taken occasion to note the feelings of inferiority generated in the "hearts and minds of Negro children, when [they are] separated solely because of their race from those of similar age and qualification." Brown v. Board of Education of Topeka, 1954, 347 U.S. 483, 494, 74 S.Ct. 686, 98 L.Ed. 873; Dawson v. Mayor and City Council of Baltimore City, 4 Cir. 1955, 220 F.2d 386, 387, aff'd 350 U.S. 877, 76 S.Ct. 133, 100 L.Ed. 774. The effect of the city's action here was to create another place where these feelings of inferiority could be generated, and it was all the more a humiliating indignity because this building had for years been a public school building which did not lose its identity as a public facility just because legal title changed hands. *See* Evans v. Newton, 1966, 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373. Our court recognized this particular type of burden in Palmer v. Thompson, *supra*, where we, sitting en banc, said:

"Appellants have urged a theory other than those suggested explicitly by *Reitman, Griffin* [v. County School Board of Prince Edward County] 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256 and *Evans*. We understood them to argue in terms of a protected right

to be a free and equal citizen. We understood counsel in oral argument, as well as by written brief, to state that the issue here is whether the Constitution forbids the City of Jackson from withdrawing a badge of equality. The badge of equality, presumably, was the ability to swim in an integrated municipal swimming pool—the ability to enjoy, in an integrated fashion, recreational facilities operated by a municipality for its citizens. It cannot be disputed that were the badge of equality, here the ability to swim in an unsegregated pool, to be replaced by a badge implying inequality—segregated pools, the municipality's action could not be allowed. However, where the facilities around which revolve the status of equality are removed from the use and enjoyment of the entire community, we see no withdrawal of any badge of equality." 419 F.2d at 1227.

In the present case we are faced with what did not happen in *Palmer*. There the swimming pools remained closed to all. Here the school will be open only to the white children. Free access to a public building has been replaced by a badge implying inequality. The school building is now escutcheoned "for whites only." Thus the effect of the city's action in selling a public building to an institution which it knew would practice racial discrimination was to place a special burden and a badge of opprobrium on the Negro citizens of Brighton, Alabama.

It has long been settled that when a statute or official action has the effect of discriminating between racial groups it is constitutionally suspect, Bolling v. Sharpe, 1954, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884, and the state must come forward with a valid and compelling state interest to justify its action. McLaughlin v. Florida, 1964, 379 U.S. 184, 85 S.Ct. 283, 13 L.Ed.2d 222. Here the City of Brighton has alleged no compelling reason necessitating its sale of the school building to the Hoover Academy. On the contrary, the record is quite clear that the result of the city's action, the establishment of a private white school in the City of Brighton, was *not* even the unintentional effect of a fortuitous sale, much less the result of a valid compelling purpose. Rather, the record shows that the city got just what it intended and planned to achieve. In evaluating the constitutionality of official action the court may examine, in addition to its effect, the historical context and the conditions existing prior to the action. Reitman v. Mulkey, *supra*. In the present case such an examination makes the legislative purpose which motivated the City of Brighton to make the sale abundantly clear. It should be remembered that this sale was an afterthought, a substituted arrangement entered into only after the United States District Court informed the parties that a lease to the academy, a discriminatory institution, would violate the Fourteenth Amendment. The transformation from a leasing arrangement to a sale is almost sardonic in its cynicism and makes it obvious that the city was completely aware of the buyer's racial policies at the time the sale was consummated. Moreover, the historical context in which this activity occurred is extremely illuminating. The year 1969 was a febrile and frenetic year of desegregation freighted with plans for compliance, court decrees, and schemes of evasion. The city's decision to sell the old school building to a private segregated school came at a critical period in the long and tortuous struggle over the desegregation of the public schools in Jefferson County, Alabama. Beginning in 1965 with United States v. Jefferson County Board of Education, 5 Cir. 1965, 349 F.2d 1021, the Jefferson County Board of Education has been under increasing pressure from this court to desegregate its public schools. By June of 1969, two months before the sale of the Brighton Junior High School, this court once again examined the Jefferson County system and found that only 3.43% of the Negro students attended previously all-white

schools in the 1968–1969 school year. United States v. Jefferson County Board of Education, *supra*, 417 F.2d 834. We then held that freedom of choice had not disestablished the dual school system in Jefferson County and ordered that school board to submit meaningful disestablishment plans by August, 1969. Those plans were to be designed to accomplish desegregation in student and faculty assignment, school bus routes, all facilities, all athletic and other school activities, and all school location and construction activities for the 1969–1970 school year. This was the broadest and most telling order issued to the school board and clearly compelled more than the token desegregation heretofore achieved in that school system. Two months later the City of Brighton sold the old school building to the Hoover Academy. In this historical context we would have to be more naively unsophisticated than this job allows [3] to fail to recognize that the city fathers of Brighton, Alabama, in the summer of 1969, were integrally involved in facilitating the founding and funding of a private segregated school in order to afford the white children of Brighton the opportunity to continue their education in a segregated facility. The sale was nothing more than an attempt to encourage, aid, and facilitate the continued segregation of children by race during the educational process. This continued encouragement of racial segregation is of course an invalid purpose. Reitman v. Mulkey, *supra*; Hall v. St. Helena Parish School Board, E.D.La., 1961, 197 F. Supp. 649 (three judge court) aff'd 368 U.S. 515, 82 S.Ct. 529, 7 L.Ed.2d 521. ■ Thus, far from showing a valid compelling state interest for its action which would justify the burden placed upon Brighton's racial minority, the city has demonstrated that it was attempting to achieve by private means that which this court had forbidden by state means in the *Jefferson* cases, *supra*. Consequently, the sale of the Brighton Junior High School to the Hoover Academy must be rescinded because it was a violation of the Fourteenth Amendment rights of the plaintiffs and members of their class to equal protection of the laws.

We do not find anything in this decision inconsistent with out decision in Derrington v. Plummer, *supra*. In *Derrington* where we held that the lessee's discriminatory operation of a restaurant in the Harris County Courthouse was state action, we said in dicta that "a county may in good faith lawfully sell and dispose of its surplus property, and its subsequent use by the grantee would not be state action." Whatever may be the continuing validity of this dicta in light of subsequent Supreme Court decisions, we find it inapplicable to our case because we have here made no determination concerning state involvement in the *operation* of Hoover Academy. Moreover, the requirement that the sale be made in good faith we think entirely distinguishes our case from the statement in *Plummer,* whatever its present vitality. The sale involved here, although clothed with the habiliments of neutrality, was made with knowledge and with the purpose of encouraging racial discrimination, and it had that effect. Such action can never be taken in good faith by an instrumentality of the state.

For the foregoing reasons, the decision of the district court is reversed and

3. Regarding our knowledge of these matters Judge Wisdom in United States v. City of Jackson, Mississippi, 5 Cir. 1963, 318 F.2d 1, made the following observation in 1963:

"This disingenuous quibble must rest on the assumption that federal judges are more naive than ordinary men. Perhaps they are. Holmes thought so.

But in the sector of the law encompassed in the subject 'Civil Rights', case by case federal courts have acquired a thorough education in 'Sophisticated Circumvention'." 318 F.2d at 5 (footnotes omitted).

The years which have passed since Judge Wisdom spoke have not dulled that acuity.

the case is remanded to that court for the entry of orders consistent with this opinion.

Reversed and remanded.

## ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC

PER CURIAM:

The Petition for Rehearing is denied and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is denied.

## ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC

PER CURIAM:

The Petition for Rehearing filed on behalf of City of Brighton, Alabama is denied and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is denied.